# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

BARBARA BOSCH,                          )
                                        )
      Plaintiff,                    )
                                        )
      v.                            )    Case No. 03-1408
                                        )
SUSAN BALL-KELL and DONALD RAGER,       )
                                        )
      Defendants.                   )

## O R D E R

This matter is now before the Court on Defendants' Motion for Summary Judgment. For the reasons set forth below, the Motion [#50] is GRANTED IN PART and DENIED IN PART.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as three of the claims asserted arise pursuant to the Copyright Act of 1976, 17 U.S.C. § 101, et seq.

## BACKGROUND

Plaintiff, Barbara Bosch ("Bosch"), is an M.D. and was a non-tenured Associate Professor of Clinical Pathology and M-2 Pathology Course Director at the University of Illinois College of Medicine at Peoria, Illinois ("UICOM"). She was employed as an Associate Professor from 1992 until her resignation on July 31, 2003, was the Acting Chair of the Pathology Department from 1999 to 2001, and was the M-2 Pathology Course Director from 1998 to July 31, 2002.

Defendant Susan Ball-Kell ("Ball-Kell") was director of the animal laboratory and an assistant professor of pathology at UICOM who was appointed to be the M-2 Pathology

Course Director by Defendant Donald Rager ("Rager") in August 2002. She is not an M.D. and was not board-certified by the American Board of Pathology. Rather, Ball-Kell is a Doctor of Veterinary Medicine. Prior to his retirement in July 2005, Rager was the Regional Dean for the Peoria campus of the UICOM. UICOM is a nonprofit educational institution.

The M-2 Pathology Course Director is an administrative position in the Department of Pathology that is primarily responsible for coordinating the M-2 Pathology Course, including the assembly of the syllabus, scheduling lectures and laboratory sessions, and enlisting teachers from both faculty and visiting non-faculty. Typically, the Course Director must begin preparing for the fall M-2 course in the preceding May.

In Spring 2002, Ball-Kell, who had been off on leave, asked Rager to be reinserted back into the M-2 Pathology Course to teach. At that time, Bosch, as the Course Director, had already scheduled all of the teachers for the various lectures. In June 2002, Rager named himself Acting Chair of the Pathology Department. In July 2002, Rager informed Bosch that he was going to "redistribute" some of her work load and directed Bosch to accommodate Ball-Kell by inserting her into the Fall 2002 course. Which Bosch did not comply with this directive, Rager then unilaterally inserted Ball-Kell into the schedule. Bosch felt that she was being forced from her position as the M-2 Pathology Course Director and resigned from this position later that same day. At that time, the teaching materials to be used for the course were already substantially prepared for distribution to the students. On August 2, 2002, Rager accepted Bosch's resignation and appointed Ball-Kell as M-2 Pathology Course Director.

On August 7, 2002, Ball-Kell and a department secretary entered Bosch's UICOM office without her permission to search for and remove her teaching materials. Ball-Kell

then used these teaching materials without permission in the 2002 and 2003 courses. They reported their entry to Rager, who had the locks changed on the door of Bosch's office. Rager told Bosch that it had been done in response to an unauthorized person entering her office during the night and removing University property. On August 16, 2002, he removed her from the Committee on Instruction and Appraisal. From August 6, 2002, until October 2002, Bosch did not return to the UICOM campus because she was no longer the Course Director and had not been scheduled to teach any courses. Furthermore, the locks on the Pathology Department doors were changed, and Bosch did not receive a key until December 2002.

On August 10, 2002, Bosch filed a complaint to the University's Senate Committee on Academic Freedom and Tenure. Dr. William Nicholas was assigned to investigate her allegations. Dr. Nicholas recommended that Dr. Robert Folberg be the interim chair of the Pathology Department and further recommended that Ball-Kell's involvement in the Pathology instruction course cease at the end of September 2002. On September 11, 2002, Dr. Folberg replaced Rager as the Interim Head of the Pathology Department. After some investigation into the situation involving Bosch, Rager, and Ball-Kell, Dr. Folberg told Rager and his staff that, in his opinion, they had misinterpreted the University's intellectual property rules, as they could not use course outlines and other curricular material without the permission of the originator. Dr. Folberg proposed changes to rectify the situation, but he was removed as Acting Chair in December 2002 before his changes were implemented. After removing Dr. Folberg, Rager then reappointed himself as Acting Chair.

In February 2003, Rager told Bosch that it would be in her best interests to find another position elsewhere and that her leaving would also be best for the University.

However, in June 2003, Ball-Kell scheduled Bosch to teach certain classes for the Fall 2003 M-2 Pathology Course. On July 31, 2003, Bosch resigned from her position as an Associate Professor.

Over the years, Bosch developed teaching materials for the instruction of various topics in pathology that were distributed to students enrolled in the M-2 Pathology Course at UICOM, including portions of the syllabus and examination questions. Additionally, Gerald Bartlett, who retired from his position as the Chair of the Pathology Department at the end of 1998, transferred ownership of all of his teaching materials and files to Bosch. Such materials are educational in nature.

Effective May 23, 2003, Bosch registered a work titled "General Pathology Exam Questions" with the U.S. Copyright Office as copyright registration no. TXu1-114-605. This work contains 28 pages consisting of examination questions that were used by Bosch to evaluate the performance of students at UICOM. Effective July 14, 2003, Bosch registered two additional works with the U.S. Copyright Office. The first work was titled "Orientation Sessions and General Pathology Volume I Introduction, Lectures, Objectives and Independent Study," as copyright registration no. TXu1-113-011. This work contains 78 pages and is a portion of the M-2 General Pathology Course syllabus that was distributed to students at UICOM. She also registered a work titled "General Pathology Volume I Laboratories and Objectives," as copyright registration no. TXu1-111-817. This work contains 24 pages and is a portion of the M-2 General Pathology Course syllabus that was distributed to students at UICOM.

When Bosch resigned on July 31, 2002, materials had already been sent to the printer to be compiled in the syllabus for the M-2 Pathology Course. Ball-Kell used these

- 4 -

syllabi, as well as portions of the 2001 M-2 Pathology Course syllabus that she obtained from the UICOM library. Ball-Kell also compiled examinations for the M-2 Pathology Course by using examination questions from the Pathology Department database, which included examination questions registered by Bosch. These materials were used only for educational purposes and were distributed only to students in the M-2 Pathology Course. The parties dispute whether Defendants believed that UICOM, and not Bosch, owned the materials.

Bosch bases her claim of ownership in part on information that she obtained from Gordon Comstock ("Comstock"), the Visiting Director of Medicine Intellectual Property in the Office of Technology at the University of Illinois at Chicago. At some point, Bosch contacted Comstock regarding her claimed ownership of her teaching materials. Comstock stated, among other things, that generally, "traditional academic copyrightable works created using university resources usually and customarily provided are owned by the creators. Such works need not be licensed to the university."

Moreover, Article III, Section 2(b) of the General Rules Concerning University Organization and Procedure defines "traditional academic copyrightable works" as:

> [A] subset of copyrightable works created independently and at the creator's initiative for traditional academic purposes. Examples include class notes, books, theses and dissertations, educational software (also known as courseware or lessonware), articles, non-fiction, fiction, poems, musical works, dramatic works including any accompanying mustic, pantomimes and choreographic works, pictorial, graphic and sculptural works, or other works of artistic imagination that are not created as an institutional initiative.

Section 4(a) further provides:

- 5 -

> Unless subject to any of the exceptions specified below or in Section 4(c), creators retain all rights to traditional academic copyrightable works as defined in Section 2(b) above.

Exceptions are then set forth for works created pursuant to the terms of an agreement with an external party, works created as a specific requirement of employment or an assigned university duty, works specifically commissioned by the University, and works that are also patentable. Works falling within the scope of university employment are defined as that term is used in the definition of "work made for hire" in the U.S. Copyright Statute, 17 U.S.C. § 101. Defendants argue that Bosch's copyrighted teaching materials invoke an exception to creator ownership, as they fall under her teaching duties because she was an employee of UICOM when she created them. Bosch contends that they are properly classified as traditional academic copyrightable works owned by the creator. She has never sold, licensed, or received any royalty for these teaching materials.

Bosch brought this Complaint alleging that Ball-Kell willfully violated her rights in her copyrighted works by copying, distributing, reproducing, and/or authorizing the reproduction, distribution, and copying of her original works by preparing derivative works without permission or authorization from Bosch in violation of her rights under § 106 of the Copyright Act (Count I). She further alleges that Rager knew or should have know of Ball-Kell's infringing activity, yet enabled, induced, or contributed to such infringement (Count II), as well as that Rager had knowledge that Ball-Kell was engaged in infringing acts and assisted in the copying, distribution, and preparation of derivative works of the copyrighted materials, making him vicariously liable for the infringement (Count III). Bosch also claims that Rager overrode her authority as the M-2 Pathology Course Director by forcing her to assign nine previously scheduled pathology lectures to Ball-Kell, which compelled her to

resign as Director.  Following her resignation as Director, she alleges that Rager undertook a campaign of extreme and outrageous harassment against her with the purpose of causing her severe emotional distress by disrupting her career, silencing her voice in the University, and forcing her from her professorship.  She specifically alleges that he: (1) cancelled her previously assigned 17 hours of lectures and six three-hour labs in the General Pathology section; (2) changed the locks on her office door and required her to obtain permission from him for access; (3) advised her that her office had been "broken into," copied all of the data from her computer, and later removed the computer from her office; (4) participated in and condoned the taking of her intellectual property without permission; (5) stripped one of her teaching assistants of his assistantship because of his perceived support for Bosch; (6) removed her from serving on the Committee on Instruction and Appraisal; (7) changed the locks on the histology lab, where supplies and specimens used in teaching pathology courses were stored; (8) created an atmosphere of intimidation toward Bosch in the department; (9) forced her to work off-campus to prevent her from effectively teaching, conducting research, or interacting with colleagues or students; (10) forbade her from communicating with the secretary for the M-2 curriculum; (11) replaced the Interim Chair of the Pathology Department when that person sought to ameliorate Bosch's situation and appointed himself as the new chair; and (12) told Bosch that the atmosphere at UICOM would never be hospitable to her and that it would be best for her and the institution if she would leave (Count IV).

Defendants have now moved for summary judgment.  Bosch has filed her response, and this Order follows.

## **DISCUSSION**

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial.  Celotex, 477 U.S. at 324.  Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]."  Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989).  Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

I.    Ownership

To establish copyright infringement, a plaintiff must prove: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Incredible Technologies, Inc. v. Virtual Technologies, Inc., 400 F.3d 1007, 1011 (7th Cir. 2005), *citing* Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).   Defendants argue that they did not infringe Bosch's copyright protections because Bosch does not own the teaching materials in question.   Rather, they contend that the teaching materials are owned by UICOM.

Specifically, Defendants argue that § 201(b) of the Copyright Act vests ownership of the teaching materials in UICOM because the teaching materials are "works made for hire."  In general, a copyright "vests initially in the author or authors of the work."  17 U.S.C. § 201(a).  That being said, "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."  17 U.S.C. § 201(b).

> A work made for hire is defined in pertinent part as "a work prepared by an employee within the scope of his or her employment."  17 U.S.C. 101.  Thus, an employer owns a copyright in a work if (1) the work satisfies the generally applicable requirements for copyrightability set forth in 17 U.S.C. § 102(a), (2) the work was prepared by an employee, (3) the work was prepared within the scope of the employee's employment, and (4) the parties have not expressly agreed otherwise in a signed, written instrument.

- 9 -

<u>Baltimore Orioles, Inc. v. Major League Baseball Players Assoc.</u>, 805 F.2d 663, 667 (7th Cir.

1986).

Defendants maintain that because UICOM hired Bosch and paid her a salary to

create the teaching materials, the materials are "works made for hire."  They point to her

September 17, 1991, Offer of Employment letter, which provides in relevant part:

> TEACHING.  I expect that you will take an active role in the
> undergraduate teaching mission of the Department of
> Pathology.  This will include both direct instruction(lectures,
> conferences, laboratories, etc.) and course coordination.  After
> a year's phase-in period, I expect you will be involved in at
> least 30 hours of direct instruction and coordination of at least
> one third of the M-2 pathology curriculum.  Your responsibilities
> may be in almost any portion of the curriculum, wherever the
> need is greatest.

> SCHOLARSHIP. . . .The second type of scholarly work in
> medical education involves the conception, design,
> development and assessment of new instructional materials,
> ranging from textbooks to interactive videodisk instructional
> programs.

Defendants then look to the deposition testimony of Dr. Bartlett, who was the

Pathology Department Chair that hired Bosch at UICOM, to bootstrap the teaching

materials into a work for hire.  Dr. Bartlett indicated that the primary role of a Pathology

educator is to "teach second-year medical students the core concepts of pathology

primarily in a classroom laboratory setting." (Bartlett Dep. at 13-14)  This would entail a lot

of preparation. "The decision is what's the best way to teach the topic or topics for which

you're responsible in the time allotted; preparation of materials that may be helpful to the

students."  (Bartlett Dep. at 14)  Additionally, UICOM has some kind of informal policy

whereby faculty are expected to provide handout materials to students.  (Bartlett Dep. at 18)

However, it would appear that in the academic setting, different considerations may apply.  The Seventh Circuit has noted that § 201(b) of the Copyright Act is "general enough to make every academic article a 'work for hire' and therefore vest exclusive control in universities rather than scholars."  Weinstein v. University of Illinois, 811 F.2d 1091, 1094 (7th Cir. 1987).  The Court of Appeals directed courts to look to the university's policies, noting that the University of Illinois had adopted a policy defining "work for hire" for purposes of its employees that was part of each professor's contract with the University.  Id.

> According to the policy . . . a professor retains the copyright unless the work falls into one of three categories: (1) The terms of a University agreement with an external party require the University to hold or transfer ownership in the copyrightable work, or (2) Works expressly commissioned in writing by the University, or (3) Works created as a specific requirement of employment or as an assigned University duty.  Such requirements or duties may be contained in a job description or an employment agreement which designates the content of the employee's University work.  If such requirements or duties are not so specified, such works will be those for which the topic or content is determined by the author's employment duties and/or which are prepared at the University's instance and expense, that is, when the University is the motivating favor in the preparation of the work.

Id.

In Weinstein, the district court had concluded that the professor's article fell under the third prong of the University's policy because the professor was require to conduct and write about clinical programs.  The Seventh Circuit noted that the district court's

- 11 -

interpretation "collides with the role of the three categories as exceptions to a rule that faculty members own the copyrights in their academic work" because a university by definition "requires" its faculty to write.  Id.  The court then noted a tradition covering scholarly articles and other intellectual property, noting that "a professor of mathematics who proves a new theorem in the course of his employment will own the copyright to his article containing that proof."  Id.

> The University's policy reads more naturally when applied to administrative duties.   Perhaps the University forms a committee to study the appropriate use of small computers and conscripts professors as members.  The committee may publish a report, in which the University will claim copyright. We do not say that a broader reading is impossible, but such a reading should be established by evidence about the deliberations underlying the policy and the course of practice-material . . . .  We would be surprised if any member of the faculty . . . treats his academic work as the property of the University.

Id.

The Seventh Circuit addressed this situation again in Hays v. Sony Corporation of America, 847 F.2d 412 (7th Cir. 1988).  In Hays, the Court of Appeals noted a long-standing common law "teacher exception" to work for hire that exempted academic writing.  Id. at 416.

> Although college and university teachers do academic writing as a part of their employment responsibilities and use their employer's paper, copier, secretarial staff, and (often) computer facilities in that writing, the universal assumption and practice was that (in the absence of an explicit agreement as to who had the right to copyright) the right to copyright such writing belonged to the teacher rather than to the college or university.

Id.  Although the Seventh Circuit did not have to decide the issue directly, the court noted that if forced to decide the issue, it might find that the teacher exception survives the enactment of the Copyright Act based on "the havoc that [a contrary] conclusion would wreak in the settled practices of academic institutions, the lack of fit between the policy of the work-for-hire doctrine and the conditions of academic production, and the absence of any indication that Congress meant to abolish the teacher exception." Id.

The logic behind such a conclusion is compelling.  In the typical work for hire scenario, the employer assigns and directs the topic, content, and purpose of the work.  In the academic setting, an employee may be assigned to teach a particular course, but then is generally left to use his or her discretion to determine the focus of the topic, the way the topic is going to be approached, the direction of the inquiry, and the way that the material will ultimately be presented.

Defendant argues that these cases apply solely to faculty publications for scholarly review or self-promotion.  While the Court does not read the cases that narrowly, Bosch does not rely solely on the case law.  In accordance with the Seventh Circuit's admonition in Weinstein, she also offers support from the history and deliberations that occurred in implementing the University's policy.  Bosch offers evidence of the deliberative discussions behind the implementation of the University's intellectual property policy in the form of the minutes from the February 9, 1998, Senate Meeting.  The minutes reflect a discussion about the proposed revisions to the Policy on Intellectual Property, which is substantively the same as the policy provisions in question in this case.

> Senator Terry Weech (Lisc) asked if the section titled *Traditional Academic Copyrightable Works* intended to include

- 13 -

course syllabi within its scope.  Friedman believed that the listed category of "class notes" in this section is sufficiently broad to encompass syllabi.

Thus, it would appear that the legislative intent, so to speak, in passing the policy was that course materials, such as syllabi, notes, etc., were to be included within the general category of traditional copyrightable works, rather than in the exception for works for hire, and that the category of traditional copyrightable works was not limited to works prepared for scholarly journals or peer review.

Bosch also points to the findings of the Senate Committee on Academic Freedom and Tenure in reviewing her complaint.  On April 12, 2003, the Committee issued a report to the President of the University.  In this report, the Committee Chair, Anthony Graham-White, detailing the Committee's findings that Rager had violated  academic freedom in several respects.  The Committee condemned "Dean Rager's condoning of the use (and seemingly even of the purloining) of the intellectual property of a faculty member for someone else's use."  (4/12/03 Committee Report at 13) The Committee further stated:

What an instructor creates for use in the classroom is the intellectual property of the faculty member.  Dr. Bosch obtained confirmation of this from the UIC Intellectual Property Office. The Chair of the Senate Committee contacted Associate University Counsel Terence McElwee, who immediately stated, "The Copyright Policy in Article III, General Rules, applies." There, a category is noted of "traditional academic copyrightable works" that includes "class notes [and] educational software." The American Association of University Professors Statement on Copyright spells this out a little more fully, adding syllabi and examinations.  Because what is created for and in the classroom is the instructor's intellectual property, the Chancellor's office at UIC sent a memo several years ago to all faculty members advising them that students have no right to record what the instructor is saying.

- 14 -

(4/12/03 Committee Report at 14) The Committee then noted that Bosch's name had been removed from the top of the materials, suggesting that the material had been "stolen" and then "counterfieted."  (4/12/03 Committee Report at 15)  These findings are also indicative of the general practice and understanding, by both faculty and apparently also by University counsel, that teaching materials fell within the general rule of traditional academic works for which ownership would be vested in the author of the materials.

Rather than addressing any of this information, Defendants barely acknowledge it, arguing that Bosch's "reliance on what other professors believe . . . is badly misplaced" because these professors are "clearly biased, as each would like to believe they own all of the teaching materials that they create within the scope of their employment." (Defendants' Reply Brief at 42) However, this is exactly the kind of information that the Seventh Circuit considered to be critical in assessing academic ownership issues in Weinstein.  On this record, the Court cannot find that Defendants are entitled to summary judgment on their claim that Bosch did not have ownership of the teaching materials in question.  This aspect of their summary judgment motion is therefore denied.

    II.    No Infringement

Defendants then make the cursory and undeveloped argument that even if Bosch has ownership of the teaching materials, Defendants did not infringe on her rights because the material is factual, educational material.  As such, Defendants argue that any portions used were necessary to convey the underlying factual content for teaching pathology. However, they make no attempt to properly support this argument, which alone justifies the denial of summary judgment on this argument.  With all due respect, the question of

precisely what materials were used without Bosch's permission, how the materials were used, and what portion of those materials may or may not be "so rudimentary, commonplace, standard, or unavoidable" as to be non-infringing is a question of fact that cannot be resolved on the record now before the Court.  *See* Gaiman v. McFarlane, 360 F.3d 644, 659 (7th Cir. 2004) (noting that "a copyright owner can't prove infringement by pointing to features of his work that are found in the defendant's work as well but that are so rudimentary, commonplace, standard, or unavoidable that they do not serve to distinguish one work within a class of works from another.")

    III.    Fair Use

    Defendants next contend that their use of the teaching materials is immune from infringement under the "fair use" provision of the Copyright Act.  Section 107 of the Copyright Act provides:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.  In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include – (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107.

- 16 -

> Fair use was traditionally defined as a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent."  The statutory formulation of the defense of fair use in the Copyright Act reflects the intent of Congress to codify the common-law doctrine. Section 107 requires a case-by-case determination whether a particular use is fair, and the statute notes four nonexclusive factors to be considered. This approach was "intended to restate the [pre-existing] judicial doctrine of fair use, not to change, narrow, or enlarge it in any way." H.R.Rep. No. 94-1476, p. 66 (1976), U.S.Code Cong. & Admin.News 1976, pp. 5659, 5680."[T]he author's consent to a reasonable use of his copyrighted works ha[d] always been implied by the courts as a necessary incident of the constitutional policy of promoting the progress of science and the useful arts, since a prohibition of such use would inhibit subsequent writers from attempting to improve upon prior works and thus ⋯ frustrate the very ends sought to be attained."

Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 549 (1985).

Here, there is no real dispute that the use occurred for non-profit, educational purposes.  Defendants further maintain that they received no personal financial or other gain and that the use was done on an emergency basis necessitated by Bosch's abrupt resignation shortly before the beginning of the fall M-2 Pathology Courses.  That being said, the central purpose of this inquiry is to see "whether the new work merely 'supersede[s] the objects' of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative."  Campbell v. Acuff-Rose Music, Inc., 510 U.S.  569, 579 (1994), *citing* Harper & Row, 471 U.S. at 562. On the record before the Court, there is no indication that Defendants' use was transformative; to the contrary, there is evidence in the record indicating that, at least in part, Ball-Kell simply removed Bosch's name from her teaching materials and used them

as her own.  Fair use has not been traditionally recognized as a defense to charges of copying from an author's as yet unpublished works.  Id., at 551.  Evidence of bad faith conduct or predatory intent is also relevant to this inquiry.  Sony Corp. v. Universal City Studios, 464 U.S. 417, 448 (1984); Weissmann v. Freeman, 868 F.2d 1313, 1323 (2nd Cir. 1989).  Accordingly, this weight to be attributed to this factor is not as one-sided as Defendants suggest and does not mandate granting summary judgment in their favor.

It is also essentially undisputed that the works in question are in large part factual and scientific in nature.  That being said, the works were also unpublished, which although not dispositive, weighs against a finding of fair use.  "Creation of a nonfiction work, even a compilation of pure fact, entails originality."  Harper & Row, 471 U.S. at 547; see e.g., Schroeder v. William Morrow & Co., 566 F.2d 3 (7th Cir. 1977).  "Yet copyright does not prevent subsequent users from copying from a prior author's work those constituent elements that are not original-for example, quotations borrowed under the rubric of fair use from other copyrighted works, facts, or materials in the public domain-as long as such use does not unfairly appropriate the author's original contributions."  Id., at 548.  As the Court previously noted in this Order, the record before the Court is not sufficiently developed regarding the degree to which the materials reflect non-original elements that are part of the public domain or original contributions by Bosch.  Accordingly, the Court cannot find that this issue does not also present a genuine issue of material fact.

With respect to the third factor, Defendants contend that their use of the teaching materials is *de minimus* and insubstantial.  However, the Supreme Court has held that a taking may not be excused merely because it is insubstantial as compared to the original

work, as "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." Id., at 565.  While they contend that there are only 21 pages that allegedly infringe the copyrights, the degree and extent of the alleged infringement is a question of disputed fact, as Bosch has also alleged subsequent infringements and infringing use of handout materials, as well.

Finally, Defendants argue that their use of the teaching materials for non-profit educational purposes had no effect upon the potential market or value of the materials. They maintain that this results in a "rebuttable presumption that the plaintiff [has] suffered no market harm and thus ha[s] the burden of proof on market effect." Princeton University Press v. Michagan Document Services, Inc., 99 F.3d 1381, 1407 (6th Cir. 1996).  Bosch has introduced some evidence indicating that there is a market for pathology syllabi and examination questions, as well as that while she has not yet commercialized her materials, she "may well do so in the future."  (Bosch Dec. at ¶ 14-15) As the proper inquiry for this factor is "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." Campbell, 510 U.S. at 590.    "Fair use is a mixed question of law and fact." Harper & Rowe, 471 U.S. at 560.  While Bosch's ability to succeed on her infringement claim at trial is far from clear, Defendants' view of the facts of this case is overly narrow and skewed to the point that the Court would have to construe all facts and reasonable inferences in their favor to grant them the relief requested, which is directly contrary to the Court's obligation in resolving a motion in which Defendants are the moving party.  Where, as here, many of the facts relevant to the inquiry are either not before the Court or are in

dispute, a motion for summary judgment is not appropriately granted on the issue of whether Defendants' use of Bosch's teaching materials constituted a fair use immune from claims of infringement.

IV.     Damages and Injunctive Relief

Defendants contend that, even assuming that the infringed on Bosch's copyrights in a way that is not excused as fair use, Bosch is precluded from obtaining any award of damages or injunctive relief.  Section 504(a) of the Copyright Act provides:

> [A]n infringer of copyright is liable for either — (1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or (2) statutory damages, as provided by subsection (c).

17 U.S.C. § 504(a).  Bosch effectively concedes that she has yet incurred no actual damages, but cites McRoberts Software, Inc. v. Media 100, Inc., 329 F.3d 557, 566 (7th Cir. 2003), for the proposition that a hypothetical fee for "lost license" or the value of the infringing use to Defendants can be considered so long as the amount is not based on "undue speculation."

Defendants then argue that Bosch is precluded from obtaining any statutory damages.  Section 504(c)(2) provides in relevant part:

> The court shall remit statutory damages in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107, if the infringer was: (i) an employee or agent of a nonprofit educational institution, library, or archives acting within the scope of his or her employment who, or such institution, library, or archives itself, which infringed by reproducing the work in copies or phonorecords . . .

- 20 -

17 U.S.C. § 504(c)(2).  However, as has been repeatedly held in this Order, questions of material fact abound with respect to Defendants' motivation in using Bosch's teaching materials and the reasonableness of any belief they may have had with respect to the permissibility of using such materials.  Accordingly, summary judgment is not appropriately granted on this issue.

Defendants also challenge Bosch's ability to seek injunctive relief, as Ball-Kell has resigned from teaching, and Rager has retired.  In support of their argument, Defendants rely on Wernsing v. Thompson, where the Seventh Circuit held that "[t]he necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."  423 F.3d 732, 745 (7th Cir. 2005).

Bosch responds that Defendants' discontinuation of unlawful conduct does not make the dispute moot, as Ball-Kell apparently taught as recently as 2005, and Rager  remains a board member at Bradley University "and is certainly in a position to influence that university's educational practices."  With all due respect, Bosch's argument misses the point.  It is far from apparent how Rager could pose some "cognizable danger of recurrent violation" as a result of his position as a board member at another university, nor is it obvious how Ball-Kell would be likely to infringe on Bosch's copyrights if she has resigned from teaching.  If neither Defendant is in a position to commit further acts of infringement by using her protected works, then Bosch has demonstrated nothing more than the mere theoretical possibility of future harm that was found to be insufficient in Wernsing.  Finding

no genuine issue of material fact requiring resolution by a jury, the Court concludes that Defendants are entitled to summary judgment on Bosch's request for injunctive relief.

 V. Contributory and Vicarious Infringement

 Defendants maintain that Rager cannot be liable for contributory or vicarious infringement, as Bosch's claims of contributory and vicarious infringement against Rager depend on Ball-Kell's direct infringement, and Ball-Kell is not liable for direct infringement. As the Court has not found that Ball-Kell is not liable for direct infringement, this argument is summarily rejected.

 Defendants alternatively argue that Bosch has failed to present any evidence that Rager either (1) knew of the infringement and induced, caused, or materially contributed to the infringing activity by Ball-Kell or (2) had the right and ability to supervise the infringing activity and had a direct financial interest in exploiting Bosch's teaching materials. Each argument will be addressed in turn.

 With respect to Defendants' first argument, Bosch responds that under Sony Corp., a contributory infringer is someone who "was in a position to control the use of copyrighted works by others and had authorized the use without permission from the copyright owner." The Copyright Act does not expressly assign liability for infringement committed by another. Sony Corp., 464 U.S. at 434. However, "the absence of such express language in the copyright statute does not preclude the imposition of liability for copyright infringements on certain parties who have not themselves engaged in infringing activity." Id., at 435. The Supreme Court noted that contributory infringement is "merely a species of the broader

- 22 -

problem of identifying the circumstances in which it is just to hold one individual accountable for the actions of another." Id.

The Supeme Court acknowledged a category of claims of contributory infringement in which "the contributory infringer was in a position to control the use of copyrighted works by others and had authorized the use without permission from the copyright owner." Id., at 437-38.   In order to support a claim of contributory infringement, a plaintiff must demonstrate:  "(1) direct infringement by a primary infringer, (2) the defendant's knowledge of the infringement, and (3) the defendant's material contribution to the infringement." Monotype Imaging, Inc. v. Bitstream, Inc., 2005 WL 936882, at *5 (N.D.Ill. April 21, 2005), citing Marobie-Fl, Inc. v. National Association of Fire and Equipment Distrib. And Northwest Nexus, Inc., 983 F,Supp. 1167, 1178 (N.D.Ill. 1997).  In determining whether a defendant is liable for contributory infringement, courts must consider the respective magnitudes of the infringing and noninfringing uses, whether the defendant encouraged the infringing uses, and efforts made by the defendant to eliminate or reduce infringing uses.  In re Aimster Copyright Litigation, 334 F.3d 643, 649-53 (7th Cir. 2003).

Here, there remains a genuine issue of material fact with respect to whether Ball-Kell directly infringed Bosch's copyrights or is protected by the doctrine of fair use.  Bosch has also introduced evidence from which a reasonable fact-finder could  conclude that Rager was aware of Ball-Kell's taking of the teaching materials from Bosch's office and use of them in teaching the M-2 Pathology Course.  It would also be reasonable to infer that despite this knowledge, Rager did nothing and even took steps to suggest that the entry into her office and removal of the materials was done by some unknown person, when Ball-

Kell and the department secretary had reported to him that they entered Bosch's office and retrieved her teaching materials. There is also evidence that Rager authorized the copying of Bosch's computer files under the same pretext that the unknown person had tampered with her computer during the break-in. At that time, Rager knew that Bosch had not consented to the use of her materials by Ball-Kell. He was then advised by Dr. Folberg that Bosch's teaching materials could not be used without her permission, yet he did nothing to further investigate or stop the ongoing infringement by Ball-Kell. While Rager's knowledge and intent remain hotly disputed, the Court cannot assess credibility in resolving a summary judgment motion. As there is sufficient evidence of record from which a reasonable jury could conclude that Ball-Kell infringed on Bosch's copyrights with Rager's knowledge, that Rager attempted to cover-up the circumstances leading up to the infringement, and that Rager supported or at least did nothing to stop the infringement, Bosch is entitled to proceed to trial on her contributory infringement claim.

In order to support her claim of vicarious infringement, Bosch must establish: "(1) direct infringement by a primary infringer, (2) a direct financial benefit to the defendant, and (3) the defendant's right and ability to supervise the infringers." Id., at *7, *citing* Marobie-Fl, 983 F.Supp. at 1179. The Seventh Circuit has held that "a defendant is vicariously liable for copyright infringement if it has 'the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.'" Hard Rock Café Licensing Corp. v. Concession Services, Inc., 955 F.2d 1143, 1150 (7th Cir. 1992).

Again, the Court has found issues of material fact with respect to whether Ball-Kell directly infringed on Bosch's copyrights. There is also evidence indicating that Rager, as

Regional Dean and self-appointed Acting Chair of the Pathology Department, had both the right and ability to supervise Ball-Kell. That being said, Bosch concedes that there is no evidence that Rager benefitted from the infringement in a direct manner but argues that he benefitted indirectly in the sense that he did not have to expend the funds to license the works from Bosch. Respectfully, the Court must disagree, as the test set forth in Hard Rock Café, Monotype Imaging, and Marobie-FI clearly requires evidence of a direct financial interest by the purportedly vicarious infringer, and any financial benefit to be had by not spending the funds to license the works would have been realized by the UICOM, not Rager. The Court must therefore conclude that no reasonable jury could find in favor of Bosch on this question, and Rager is entitled to summary judgment on the vicarious infringement claim.

VI.  Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress under Illinois common law, Bosch must show that: (1) the defendant's conduct was extreme and outrageous; (2) the defendant intended to inflict severe emotional distress or knew there was a high probability that his conduct would cause severe emotional distress; and (3) the defendants' conduct did cause severe emotional distress. See Lifton v. Board of Education of City of Chicago, 416 F.3d 571, 579 (7th Cir. 2005); Van Stan v. Fancy Colours & Co., 125 F.3d 563, 567 (7th Cir. 1997); Doe v. Calumet City, 641 N.E.2d 498, 506 (Ill. 1994); McGrath v. Fahey, 533 N.E.2d 806, 809 (Ill. 1988). Conduct is extreme and outrageous only if "the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency . . . ." Public Finance Corp. v. Davis, 360 N.E.2d 765, 767

(Ill. 1976); <u>Kolegas v. Heftel Broad. Corp.</u>, 607 N.E.2d 201, 211 (Ill. 1992); <u>Cook v. Winfrey</u>, 141 F.3d 322, 331 (7th Cir. 1998).  Moreover, "as to the third prong, an action may lie 'only where the distress inflicted is so severe that no reasonable man could be expected to endure it.'" *See* <u>McNamara v. Guinn</u>, 2000 WL 1222128, at *3-4 (N.D.Ill. August 23, 2000), *citing* <u>McGrath</u>, 533 N.E.2d at 809.

Even when construed in the light most favorable to Bosch, the actions that she alleges were taken against her by Rager do not rise to the level of "extreme and outrageous" conduct as a matter of law.  In summary, Bosch complains that Rager: (1) appointed himself Acting Chair and placed himself in a position of authority over Bosch; (2) created an atmosphere of harassment and intimidation; (3) usurped her authority as Course Director and reassigned her lectures/labs; (4) changed her office locks and required her to get a key from him; (5) condoned the invasion of her office and removal of her teaching materials, as well as the subsequent use of the materials without her permission; (6) removed Bosch from the Committee on Instruction and Appraisal; (7) changed the locks in the Pathology Department to hinder her access; (8) forced her to work off-campus to isolate her and forbade her from talking to the department secretary; (9) dismissed Dr. Folberg when he attempted to remedy the situation in Bosch's favor; and (10) effectively forced her from her positions as Course Director and Associate Professor.  While this conduct, if truly motivated by retaliatory animus, would certainly be inappropriate and reprehensible, Illinois court have set a particularly high threshold where the alleged emotional distress occurs in the employment context, as the workplace environment is

particularly susceptible to personality conflicts, questioning job performance, demotions, terminations, and other disciplinary actions.  Van Stan, 125 F.3d at 567-69.

"'[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities' do not amount to extreme and outrageous conduct, nor does conduct 'characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" Id. at 567 (finding that terminating an employee known to have bipolar disorder, phoning him at home during vacation to inform him of his termination, and providing a false explanation for the termination was not enough to support an IIED claim); Cook, 141 F.3d at 331; *see also*, Harriston v. Chicago Tribune Co., 992 F.2d 697, 703 (7th Cir. 1993) (finding that conduct was not extreme and outrageous where employer reprimanded plaintiff for no reason, refused to allow her to participate in a management incentive fund, forced her out of her management position, promised her a promotion that she never received, took away her major accounts, excluded her from office activities, monitored her telephone calls, and ignored concerns for her health and safety after her personal property was damaged on company property).  In fact, courts have held that conduct by an employer that does not attempt to coerce a plaintiff into committing a crime or sexual misconduct fails to exceed the threshold necessary to establish the level of outrageousness necessary to maintain an IIED claim.  Fang v. Village of Roselle, 1996 WL 386556, at ** 3-4 (N.D.Ill. July 5, 1996), *citing* Pavilon v. Kaferly, 561 N.E.2d 1245, 1251-52 (Ill.App.Ct. 199); Bailey v. Unocal Corp., 700 F.Supp. 396, 399 *N.D.Ill. 1988); Isaacson v. Keck, Mahin & Cate, 1993 WL 68079, at *8 (N.D.Ill. Mar. 10, 1993); Harriston,

992 F.2d at 703; <u>Stoecklin v. Illinois Tool Works, Inc.</u>, 589 F.Supp. 139, 146 (N.D.Ill. 1984); <u>Balark v. Ethicon, Inc.</u>, 575 F.Supp. 1227, 1232 (N.D.Ill. 1983).

Bosch has failed to demonstrate extreme and outrageous conduct by Rager as a matter of law.  As the Court finds that no reasonable jury could find in her favor on the record presented in this case, Rager is entitled to summary judgment on Bosch's IIED claim.

### **CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment [#50] is GRANTED IN PART and DENIED IN PART.  Summary judgment is granted in favor of Defendants with respect to the claims for prospective injunctive relief,  vicarious infringement, and intentional infliction of emotional distress, and denied in all other respects.  This matter is now ready for final pretrial conference.

ENTERED this 31st day of August, 2006.

                        s/ Michael M. Mihm          
                             Michael M. Mihm
                        United States District Judge